## GEORGE A. OHL & CO. v. FALSTROM & TORNQVIST CO.

(Circuit Court, D. New Jersey. January 28, 1909.)

1. PATENTS (§ 328*)—INFRINGEMENT—BRAKE FOR CORNICE MACHINES.
    The White patent, No. 427,025, for a brake for cornice machines, construed, and *held* not infringed.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 328*)—INFRINGEMENT—POWER PRESS.
    The Ohl patent, No. 679,031, for a power press especially adapted for bending metal, construed, and *held* not infringed.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

3. PATENTS (§ 236*)—INFRINGEMENT.
    One rightfully using a machine for a few weeks or months does not become an infringer solely because the machine during such rightful use, and because of it, became slightly worn so as to bring a part within the terms of a patent.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 236.*]

In Equity.

Hector T. Fenton, for complainant.

Russell M. Everett and Leo J. Matty, for defendant.

CROSS, District Judge. The bill of complaint is founded upon two patents owned by the complainant, the first of which was issued April 29, 1890, to James White, assignor to the Vulcan Company, for a brake for cornice machines, and is known as No. 427,025. The second, No. 679,031, for a power-press, was issued July 23, 1901, to George A. Ohl, Sr., George A. Ohl, Jr., Frederick W. Theberath, and August A. Berghof, assignors to the complainant. The first of the patents contains the following claim only:

"The combination, with the pulley-shaft. and clutch-pulley, of a treadle to actuate the clutch, a spring to hold the clutch normally disengaged, a friction-wheel upon the pulley-shaft, the carrier, c, mounted movably in the socket, d, and holding the brake-block, b, adjacent to the friction-wheel, and the cam, e, and lever, p, connected with the treadle by the rod, q, and operated as shown and described."

This patent, which it is claimed is infringed by the defendant's machine located and in use in its business at Passaic, N. J., expired four days after this suit was commenced. The application as originally made contained two claims, the first of which, containing no reference to the cam, e, was stricken out because as to that claim the examiner found no invention over prior patents No. 278,601, to Rohde, and No. 365,439, to Kasey. The action of the examiner in that respect was acquiesced in by the applicant, and the patent as allowed contained but the one claim above set forth. The claim stricken out and the one allowed were so much alike, except for the presence of the cam, e, in

the claim allowed, that that element must be taken as its distinguishing feature, and the one which procured the allowance of the patent. This conclusion, moreover, is in accord with the testimony of defendant's expert. Such being the case, the defendant's device, because it has no cam, does not, in my judgment, infringe the patent in question. This, however, is a disputed point. It is true that a certain diagram of the defendant's brake, prepared by one of the complainant's witnesses, shows mechanism not unlike a cam, but in rebuttal the defendant produced and offered in evidence the brake-lever itself, which upon inspection discloses nothing of the kind. As the defendant's expert says:

"The movement of a cam is always around or partially around a center. * * * A piece of mechanism having this rotary or partially rotary motion, and which by its rotary or partially rotary motion transmits motion to another element by decreasing or increasing the distance of this other element from the axis of the cam, acts like a cam, and is a cam."

The defendant's brake is substantially like those in the prior art, which were cited as anticipations of the patent in suit. An inspection of the defendant's brake-lever and of the adjustable screw-head against which it acts discloses no cam movement. A worn place, constituting a very slight depression, appears on the upper edge of the lever bar where it engages the head of the screw, and at one side of this depression, for a limited space, the metal has a bright appearance, showing that the head of the screw had not at all times contacted with the edge of the lever at precisely the same point, although the depression shows that for the most part it had; but whether the contact took place at the point of depression or by its side, the screw-head was always, at the time of contact, at a right angle to the plane of the lever. The lever of the brake of the defendant's machine, as also of that shown in the Kasey patent, was not placed horizontally, hence the head of the adjusting screw, standing perpendicularly as it did, could not contact therewith at a right angle. To remedy this, a slight wedge-shaped cut was filed in the upper edge of the lever, so that the base-line of the cut would present a horizontal surface to the screw-head. This cut toward the pivoted end of the lever terminated in an upward curve, and this it is that gives whatever plausibility there may be to the allegation that there is a cam in the defendant's device. Had that cut terminated in a right angle, as it might just as well have done, all appearance of cam-action would have been avoided. This curve at the end of the cut on the edge of the lever, were it brought in contact with the rounded screw-head, might justly be claimed to impart a cam movement, but it does not, as a matter of fact, engage at all with the head of the screw; on the contrary, the lever at that point, because of the cut, presents a horizontal surface to the screw-head. The diagram offered on behalf of the complainant, and intended to show cam movement in the defendant's device, is, when compared with the device itself, so exaggerated as to be misleading, and serves to draw in question the fairness and reliability of the witness who made it. It should be added that the Rohde patent shows a brake-lever contacted with a round-headed screw for the very purpose, as therein expressly stated, of avoiding friction, so that in this respect also the defendant merely fol-

lowed what was old in the art. The patents cited against the claim of the patent in suit, which was disallowed, would unquestionably have barred the defendant from procuring a patent on its brake, had it so attempted.

Turning now to patent No. 679,031, the second in suit, we find the following general description of the invention set forth by the patentees in the specifications:

"This invention has reference generally to improvements in that class of power-presses which are employed for the purpose of bending metal, or for the purpose of corrugating, crimping, or squeezing together sheet metal, or for the working of other materials.

"The present invention, therefore, has for its principal object to provide a power-press of a novel design which is especially adapted for bending metal, embodying in the construction of the machine features which will admit of a very wide range of work to be performed on the machine, the press being especially constructed for the purpose of making metal cornices.

"A further object of this invention is to provide a large and powerful press which shall be very simple in its construction and operation, the operating mechanism thereof being controlled by a foot-treadle and link-motion working a friction-clutch for rotating the main or pinion shaft of the machine and having a brake upon the pinion-shaft which effectually places the slide or hammer of the press under perfect control of the operator at all times, whereby the slide or hammer can be stopped at any part of its stroke.

"A further object of this invention is to provide an improved and quick adjustment of the slide or hammer by means of a 'frog motion,' which is actuated from a hand-lever and a pulley arranged upon the shaft or spindle bearing the frog motion, whereby two or more pitmen and eccentrics, which produce a reciprocatory motion of the slide or hammer, can be simultaneously adjusted and the movable parts of the machine still maintained in their perfect alinement."

The patent contains 21 claims, but it is unnecessary to set them forth. The answer admits, as did counsel upon the argument, that the defendant's power-press in many respects embraces features like those of the patent. The main defense is that the patentees, the predecessors of the complainant corporation, and now interested in it as stockholders, made and sold, more than two years prior to the application for the patent, several machines, all of which embodied some, and one or two all, of the patented features, or, at least, all that the defendant has adopted and embodied in its machine. Another defense set up, but which, in the view I have taken of the case, it will be unnecessary to consider, is that the patentees were not in fact joint inventors within the meaning of the statute. Application for the patent in suit was filed March 5, 1901, and the evidence shows that seven presses had been made and sold by the patentees prior to that time; the first of them in 1893, and the last in 1898. It is true there is some discrepancy in the testimony as to the exact dates when the several machines were built and sold, but that is immaterial, since the evidence satisfactorily shows that they were all built considerably more than two years prior to the filing of the application for the patent now under consideration. The evidence was more particularly directed to, and the stress of the argument laid upon, the earlier presses which are known in the case as the Westergren 13-foot press, and the Westergren 10-foot press. The former was built and sold to Mr. Westergren in 1895, and the latter in 1898, and both of them were subsequently and continuously used by

him in his business at Jersey City, N. J. It appears by the evidence that presses of the character involved in this controversy, weigh from 9 to 14 tons, and it is apparent that because of their great weight they could not be produced in court; hence it is that their appearance, design, and method of construction have necessarily been shown by means of certain photographs and drawings, which were produced and proved. The drawings, for the most part, relate to the Westergren 13-foot press; they are drawn to the same scale as those of the patent, and the several parts are likewise numbered to correspond therewith. Thus comparison between them is rendered easy and accurate. They were prepared by a mechanical engineer directly from the Westergren press, and seemingly disclose accurate and careful work. A comparison of them, with the drawings of the patent in suit, not only as a whole, but part for part, and combination with combination, shows, except in some minor details, which will be referred to later, remarkable similarity. Only a close and careful inspection will enable the nonexpert eye to note any differences. No attack is made upon the authenticity or correctness of these drawings, and it satisfactorily appears that they are a faithful reproduction of the Westergren 13-foot press, as it existed at the time they were made. Nevertheless, the complainant contends that material alterations have been made in that press since it was sold to Mr. Westergren. This point will be considered later. As already intimated, if the claim of the defendant as to this machine is true, it clearly anticipates substantially all of the improvements of the patent.

In considering the question of the likeness or unlikeness of the earlier presses to the patent in suit, it should be particularly noted that the testimony of the complainant's expert has no bearing whatever, as he admitted that he had no acquaintance with the prior art, and his testimony was accordingly limited to a comparison of the defendant's machine with the patent in suit. On the contrary, the defendant's expert, after an examination of the Westergren presses, and the photographs and drawings thereof, and of the other earlier presses in evidence, and the prior art in general, carefully went over each claim of the patent under consideration and showed wherein it was, in his opinion, anticipated by the prior art, and then summarizes the evidence, in which he is uncontradicted, in the following language:

"I have shown that all the features set forth, illustrated, and claimed in the Ohl et al. patent in suit, with the exception of the abutments, 84, on the top crosspiece, are old in the Westergren 13-foot machine, and that the Westergren machine differs only from what is shown, described, and claimed in the patent in suit in regard to these abutments and a few details in connecting rods for transmitting motion from the foot treadle to other parts, particularly the brake and clutch on the main shaft.

"I have shown that the use of the cam is not found in defendant's machine, but that defendant uses devices like those shown in patents issued prior to the White patent in suit, namely, the cam, and that defendant's machine does not contain the essential and vital features of the White patent, a feature which alone made the issuance of the White patent possible. * * *

"I have stated that all the features set forth, illustrated, and claimed in the Ohl et al. patent are found in the Westergren 13-foot machine, with the exception of the abutments on the top crosspiece, which are marked '84,' are not found in the Westergren 13-foot machine, but these abutments are found .

in the Ringle machine, and in the Bliss and Stiles & Parker press catalogues. The Ringle machine I refer to is the one illustrated in photo No. 1 of the 'Defendant's Exhibit Ringle Hand-Power Press,' and also in Photo No. 2 of the same press.

"I also omitted to state that while the frog motion and the lever connections between the treadle, clutch, and brake in the Westergren 13-foot machine are not absolutely identical with those of the patent in suit to Ohl et al., I should have also stated that this frog motion and the lever connections between the treadle, clutch, and brake of Ohl et al. patent in suit are found in the Westergren 10-foot machine."

The distinction that he notes in the last paragraph of the quotation in respect of a slight difference in the lever connection need not be considered further, in view of the fact that, as already shown, the defendant's brake does not infringe the White patent, and, since it does not infringe that patent, it cannot this, which likewise has a cam-shaped link, 63, with a cam-head, 64. There are also other differences, which, however, under the circumstances, need not be considered.

Turning to the frog motion it is, as defendant's expert says, shown in the same form and combination in the Westergren 10-foot press, and also in the Westergren 13-foot press, with this difference, that in the latter there are three gears instead of two. The testimony, however, discloses that the third gear in the Westergren 13-foot press was due to an error of distances between centers, from which mistake arose the obvious necessity of inserting another gear to cover the increased distance, and permit the pinions properly to engage, and that it was easier to do this than it was to lessen the distance between the centers. There is no invention, however, in merely adding or taking away a gear. New Departure Bell Co. v. Bevin Bros. Manufacturing Co., 73 Fed. 469, 476, 19 C. C. A. 534.

What the defendant's expert, in the extract from his testimony above made, has called abutments on the top crosspiece, are elsewhere spoken of as "depending bearings," and are identified on the patent drawings by the number "84." These bearings, however, appear in the Ringle hand machine, and in the Stiles & Parker catalogue of 1890, and in the Bliss catalogue of 1894. These exhibits show central half bearings depending from the top leaf of a press, and engaging the upper side of a rotary shaft carrying eccentrics to exert pressure. The function of the depending or half bearing is the same in the exhibits as in the patent in suit; they were obviously inserted to prevent any upward spring or bend of the shaft, and could have no other function. There certainly would be no invention involved in constructing two of these bearings upon a longer shaft, when it was old to have one upon a shorter shaft, as in a hand press. Indeed, there is much doubt whether the idea, if original, would involve invention, for it would seem as though a skilled mechanic, if he found a tendency in a shaft to spring or bend upward, would stiffen it by inserting a brace of this character just as naturally as he would place a similar support underneath a shaft if he found it inclined to sag. But this question need not be pursued, since, as has been shown, the idea was old in the art, and gains nothing by the alleged combination. The only differences between the presses manufactured by the complainant, and which constitute to a great extent the prior art in this case, and the press described in the patent in suit, so

far as testified to by the defendant's expert, have thus been considered.

Turning now to the testimony of Mr. Ohl, Jr., one of the patentees, it will be found that, in response to a question by his counsel asking him to name some of the leading features of the improvements in his patented press as compared with the early six or seven presses, he says:

"Of all the earlier presses which refer to those made before March 14, 1889, none of them had the depending lug to support the main shaft, 68, of the Ohl patent. The Ringle press had no vises to grasp the top die, and this die was held to the slide or hammer by means of bolts. The other earlier presses made before March 14, 1889, had vises to hold the top die, but the die was rigidly held to the slide or hammer without any means to supply lost motion, and the right and left vise screws had no lost motion. The Ringle press had no 'frog motion,' and the adjusting device was operated by means of a straight and cross belt; the Machwirth press the same; the Badger press the same, with additional bevel and spur gears; the Seton press had four gears and a frog lever on the right-hand side of the machine, and three additional gears on the left-hand side of the machine, making seven gears in all, and an entirely different device than that shown in the Ohl patent. The Westergren 13-foot press had four gears in the frog motion, and the Westergren 10-foot press had a different design of eccentrics, eccentric straps. The bottom of the bevel gear and the spiders were different."

Later in his testimony he specified, as an additional improvement, openings in the housings for the removal of the work and dies. The foregoing are all of the material differences that he or any of the other patentees were able to point out between the prior art and the patent in suit. Those of the depending or half bearings and the three gears in the frog motion have already been considered and disposed of. Of those remaining which require consideration the first has to do with what is called the means for supplying lost motion.

It is admitted that the Westergren 13-foot press, as now constituted, shows the same method of supplying lost motion that is claimed in the patent, but the complainant insists that the device was inserted and other changes made since the grant of the patent. Each of the parties has offered considerable testimony upon this point, which, in my judgment, is the only one upon which there can be any reasonable doubt that the 13-foot press is not now in the same condition that it was when sold to Mr. Westergren. In all other essential respects, outside of repairs, the testimony establishes conclusively that the press is now as it was then. In considering the weight of the testimony and the credibility of the witnesses, one cannot but be influenced by the fact that the patentees, in applying for their patent, claimed all of the alleged improvements as new, when beyond controversy they must have known that all or nearly all of them were old; for it must not be forgotten that the earlier presses had been made by them or under their supervision, and that their elements and combinations were consequently familiar to them. As against their testimony, we have that of two witnesses who were in the complainant's employment while the Westergren 13-foot press was being built, but who left such employment before its completion, one of them going with Mr. Westergren and the other to a different employment. Subsequently, however, in 1900, and shortly before the patent in suit was applied for, these men jointly engaged in the business of manufacturing presses,

and thereafter built the defendant's alleged infringing press. It seems not altogether improbable that it was their engagement in a similar business with that of the patentees that suggested to them the advisability of procuring a patent, which, judging from the lapse of time since they began the manufacture of such presses, was apparently an afterthought. Admitting, as we must, that the two witnesses just referred to, as well as the patentees, are interested, there still remain three or four other independent witnesses, including Mr. Westergren, who swear that apart from repairs, which do not relate to the question under consideration, the 13-foot press is now just as it was when Mr. Westergren purchased it of the complainant. No reason appears why these witnesses should be biased; yet if this press was, after its purchase, substantially reconstructed as the complainant contends, they must be that or worse, for it seems impossible that the machine could have been so radically changed without their knowledge. The idea that such changes could have been made at Mr. Westergren's factory, without his request, knowledge, or consent, is well-nigh absurd upon its face.

It has already been stated that it is a disputed question whether the device for supplying lost motion was or was not applied to the 13-foot press after that press had been sold and installed. In my judgment the evidence shows that at least the left-hand screw, which discloses the alleged invention, had not been changed, but, assuming that both had been, the conclusion reached would not be altered. In order to more clearly show what the device in question is, claim 18 of those covering this element will be quoted:

"In a power-press, the combination, with a reciprocating slide or hammer, of a pair of oppositely-placed holding-latches arranged in depressions on opposite sides of a rib in said slide or hammer, a pin or spindle rotatively arranged in a bearing in said rib, for operating said latches, said pin having a limited movement longitudinally in said bearing, and means for limiting said longitudinal movement of said pin or spindle, consisting of an annular groove in said pin or spindle, and a plate, 20, secured to said rib, having a slotted portion arranged in said groove and over said pin or spindle, substantially as and for the purpose set forth."

Its only use, as stated in the specification, is:

"That the jaws, 26, of the latches, 25, may just as firmly bite or grasp the opposite sides of the die, 31, and hold it in position, it is necessary that the pin or spindle, 15, shall be capable of a slight movement laterally across the thickness of the rib, 13, whereby the various parts will accommodate themselves to the varying depths or other inequalities in the said recesses or depressions, 33, and firmly hold the die, 31, in its position against the lower face of the slide or hammer."

That the means for providing lost motion, however, was not regarded as of any great importance, is shown by the fact that earlier in the specification it is stated that:

"The width of each groove, 19, is preferably slightly larger than the thickness of its respective holding dog or plate, 20."

The lost motion, so called, was provided for by an annular groove in the pin or spindle mentioned in the claim, into which, to hold it in its rotative position in the bearing, a holding plate was provided with a slot in the its lower end whereby the lower portion of the plate could

be fitted in the annular groove in engagement against the edges or shoulders of the groove. The function of the spindle was to hold the die clamps clasped against the upper die, and, in order to provide a slight longitudinal movement of the spindle, the holding plate was made thinner than the width of the annular groove in the spindle. The complainant has offered testimony tending to show that these plates in the earlier machines were made to fit mechanically in the grooves, notwithstanding which it undeniably appears that in those machines there always existed a slight space of the thickness of a newspaper and wide enough for a film of oil to enter. It is manifest, and the patentees admit, that the plates could not have been driven into the groove, for, had they been, the pin or spindle could not have been turned as it was required to be every time the die clamps were loosened or tightened. It appears then, not only by the evidence, but by the necessity of the case, that there was in the early machines some looseness in the fit of the plate into the groove of the spindle. That this looseness would, through use, constantly become greater, is testified to by several witnesses and admitted by one of the patentees, and the fact could not well be otherwise, for where there is constant friction there must be constant wear. The difference between the width of the groove and of the holding plate is exceedingly slight, even as made by the complainant under its patent. In the infringing machine of the defendant, the complainant's expert makes the difference only about $1/32$ of an inch; so slight a difference is scarcely perceptible to the naked eye, and is only what would be created by ordinary use in a few weeks or months. Hence, if we take a noninfringing device showing a difference of the thickness of a newspaper, it will be seen that by ordinary wear it would in a short time become an infringing device. The complainant's expert was asked on cross-examination this question:

"Supposing that the construction of clamping devices shown in the Ohl patent, 679,031, was old in the art, except as to the longitudinal movement of the pin or spindle, and which we have been speaking of as lost motion, do you think a machine in which said spindle and the holding plate had a good, ordinary machine fit would infringe?

To which he replied:

"I believe that such a spindle would have sufficient lost motion to bring it within the terms of infringement."

This reply would seem to dispose of this claim of the patent, for the reason that all the earlier machines show in this particular, if the complainant's evidence be accepted without any qualification, a machine fit, and if the evidence of the defendant be taken, it shows no care was taken to have any fit, much less a machine fit, while all alike admit that the plate had to be fitted with that degree of looseness which would permit the spindle freely to revolve, and that consequently there was always some space between the plate and the groove. If, therefore, a machine fit, as the complainant's expert says, constituted the defendant's device an infringement, the conclusion is inevitable that if all of the earlier presses had machine fits, as complainant's witnesses have testified, they were anticipations of the patent. Moreover, it may well be said that a device which demands some freedom of movement, and

which at the same time shows but $1/32$ of an inch of play in an exceedingly heavy and cumbersome machine of this character, can be little else than a machine fit; for, as one of the witnesses said, such a machine is not built with the nicety and exactness of a watch. It is not claimed that there was anything new in the clamping device outside of the means for providing lost motion, while as to the holding-plate itself, the Westergren 13-foot press showed identically that of the patent. One rightfully using a device for a few weeks or months may not become an infringer, solely because the machine during such rightful use and because of it became slightly worn. If a claim of this character can be sustained at all, it should state, with some reasonable degree of certainty and definiteness, how much lost motion is to be provided, so that it would not be left entirely to guesswork, with the result that it might subsequently be claimed that a machine fit, or even ordinary wear and tear, violated the claim and constituted an otherwise innocent party an infringer.

Before closing this branch of the case, it should be mentioned that the patentee, Ohl, Jr., says that this element of the invention was suggested by the fact that the vise-screws in the earlier presses were continually breaking; that this happened in some instances in three or four days after a machine was erected; and that the substituted screws would, in some cases, likewise break within the same period. On the other hand, Ohl, Sr., also a patentee, who had every opportunity for knowledge of the fact if it existed, says that the first vise-screw that he knew to break was in 1899.

There remains for consideration the openings in the housings which are covered by claim 21:

"In a power-press, the combination, with the bed of the press, the slide or hammer and dies, of a housing having openings therein, through which the die or the work thereon can be removed, substantially as and for the purposes set forth."

The only references to these openings in the specification are the following:

"The said housings or frames 2 and 3 are also formed with suitably disposed openings through which the dies and finish work can be removed if desired. * * *

"The construction of the holding means for holding the upper die in position is simple and perfect, and the dies are removable from either the front or back of the press, or through the openings in the housing or side frames, which is of great advantage in cases where the finish work has to be slipped from the end of the die before being able to remove the die."

Openings in the housings are, however, disclosed in the earlier presses, and were used for the purpose of removing the dies, and Theberath, one of the patentees, testifies:

"We had built presses with a bed, a slide or hammer, dies, and a housing having openings therein through which the die or work could be removed."

And again, in another place, says:

"I knew that openings in the housings to remove the top die of the hammer were made on machines before."

And he also says he does not remember that they made any presses which did not have such openings. And Ohl, Jr., another of the patentees, speaking of the early presses made prior to March 1899, says:

"Of course, it was old to have openings in the housings to remove the die."

And again:

"They had openings which were small, and permitted the removing of the dies and die-holder."

It is unnecessary to quote additional evidence, as it is apparent that similar openings had been made in the earlier presses for a similar purpose; their function was not at all altered by being made an element in a combination. But if it were the fact that the work had not previously been removed through the openings in the housings, the dies had been, and there would certainly be no invention in removing the work through the same openings, since the work rests between the dies. It would be obvious to any one, skilled or unskilled, that if the dies were thus removable the work would be also, and that, if the openings were too small for the purpose, their enlargement would afford a simple and complete remedy.

The main features wherein the patent under consideration is alleged to differ from the earlier presses have all been considered. There are a number of other alleged improvements toward which testimony has been directed, as, for instance, Mr. Ohl, Jr., differentiates the eccentrics of the new press from the earlier presses, but finally admits that they did not intend to claim a patent thereon. There is also considerable testimony upon the question of combination, some pertinent and some not, but as I think that none of the improvements discussed, in view of the prior art, are valid in combination or otherwise, further discussion is unnecessary.

My conclusion upon the whole case is that the defendant's alleged infringing press is, for the most part, but a copy of the Westergren 13-foot press, or of some one or other of the early presses, and that wherein it differs from them it does not infringe either of the patents in suit.

The bill of complainant will therefore be dismissed, with costs.